34 N.J. Super. 278 (1954)
112 A.2d 290
EDWARD B. SHIDDELL, PLAINTIFF-APPELLANT,
v.
ELECTRO RUST-PROOFING CORPORATION (N.J.), DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 11, 1954.
Decided November 5, 1954.
*280 Before Judges EASTWOOD, GOLDMANN and SCHETTINO.
*281 Mr. Edward J. Gilhooly argued the cause for plaintiff-appellant (Messrs. Gilhooly, Yauch & Fagan, attorneys).
Mr. Robert L. Hood argued the cause for defendant-respondent (Mr. William J. Egan, attorney).
The opinion of the court was delivered by SCHETTINO, J.S.C. (temporarily assigned).
Appeal is taken from a summary judgment of the Law Division granted on a motion pursuant to R.R. 4:58-2, and R.R. 4:58-3.
Plaintiff's complaint is in three counts. By the first count he claims defendant and its predecessors in interest granted him for a valuable consideration a franchise consisting of an exclusive right, vested in plaintiff for the term of his natural life, to sell defendant's rust-proofing system within certain sales territories; that in April 1946 defendant undertook to remove from plaintiff's franchise territory a part thereof and that in May 1953 defendant undertook to remove the balance of the territory, and he therefore seeks an accounting and damages based on the commissions which he would have earned were it not for defendant's alleged wrongful acts. By the second count plaintiff claims he was unlawfully discharged and seeks an accounting and damages for the commissions which were lost by him as a result of defendant's wrongful act. By the third count plaintiff claims that even if defendant had the right to terminate whatever agreement they had, plaintiff was entitled to a reasonable notice of termination of his services, that no such notice was given, and he therefore seeks an accounting and damages.
Plaintiff alleges that the original agreement was made with Electro Rust-Proofing Co., a partnership, and that defendant succeeded to the rights and obligations of the original contracting partnership and was thereby obligated to plaintiff. Plaintiff's affidavit shows that the partnership consisted of Edwin H. Ingle and his brother, Arthur W. Ingle; that the Ingles brought about the incorporation of their business; that the affairs of the partnership were later carried on by an Ohio corporation known as Electro Rust-Proofing Corporation; that in 1947 there was a merger of the corporation *282 with Cathodic Engineering Company, Inc., and that the surviving corporation is the present defendant, Electro Rust-Proofing Corporation (N.J.).
Defendant's answer admits that it is the successor in interest of the Electro Rust-Proofing Corporation, an Ohio corporation; generally denies the allegations of the complaint; specifically denies the existence of any contract or representation as alleged by plaintiff or that the obligations of any such contract were assumed by the defendant; contends that plaintiff was an independent, non-exclusive sales representative of the defendant, permitted to operate and solicit business for defendant within a certain defined territory; that plaintiff was paid all commissions on sales in the area, and that on or about May 1, 1953, defendant terminated plaintiff's right to sell its products and so advised him. The answer additionally sets up a special defense of the statute of frauds in that the contract alleged, if any, was one not intended to be performed within one year after the making thereof and was not in writing. R.S. 25:1-5(e).
Plaintiff took depositions of one Frank M. Tobin, a former employee of Electro Rust-Proofing Company, which depositions have been filed in this cause. Defendant served interrogatories which were answered by plaintiff and are also on file in this cause. In support of its motion, defendant relied upon the pleadings, interrogatories, depositions, and the affidavits attached to the moving papers on this motion.
R.R. 4:58-3 provides, in part:
"The judgment or order sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
If the pleadings and answers to interrogatories and affidavits filed in support of and in opposition to the motion show the existence of a genuine question of fact which, if proven, would establish the plaintiff's right to recovery on the issues joined by the complaint and answer, and such question of fact can be established by evidence in the form of depositions, interrogatories, *283 affidavits, and admissions which would be evidential on the trial, then the trial court erred in granting a summary judgment. If no such question of fact could be established by the record, the trial court was not in error.
Under R.R. 4:58-3 the court must find an absence of a triable issue of material fact, for the granting of the motion depends on a showing "palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Defendant's motion admits the evidence and the inferences which may properly be drawn from it and the remainder of the record and such evidence and inferences will be construed in the light most favorable to plaintiff and the motion for summary judgment will be denied in the absence of a clear showing by the moving party  the defendant  that such a judgment should be granted. In Savarese v. Pyrene Manufacturing Co., 9 N.J. 595, 599 (1952), Mr. Justice Wachenfeld for the Supreme Court said:
"It is axiomatic that on a motion for summary judgment the evidence and the inferences which may properly be drawn from it will be construed in the light most favorable to the party against whom the motion is made."
See also Heuter v. Coastal Air Lines, Inc., 12 N.J. Super. 490 (App. Div. 1951); Powell v. Fuller Brush Co., 15 F.R.D. 239 (D.C.N.J. 1954).
The laboring oar must be carried by the defendant here. On this appeal we must take as true the affidavits and depositions of the plaintiff. Gretkowski v. Wojciechowski, 26 N.J. Super. 245, 248 (App. Div. 1953). We recite plaintiff's "facts" as shown by the record. Prior to May 30, 1939, plaintiff had extensive experience as a manufacturer's representative in merchandising. While in Japan he met Frank M. Tobin, who later became factory sales representative of Electro Rust-Proofing Co. In April 1939 Tobin talked to plaintiff at the latter's home in Philadelphia with a view of engaging plaintiff to become a franchise agent for the sale of Cathodic Protective System of the partnership. In May *284 1939 plaintiff met the two Ingles and Tobin at the company's offices in Dayton, Ohio. The Ingles told plaintiff that they did not have the financial means to employ salary and expense salesmen and requested plaintiff to accept a franchise on a commission basis for the eastern half of Pennsylvania, Camden, New Jersey, the State of Maryland and Washington, D.C., with the exception of certain government projects. Plaintiff was told by the Ingles that he would have to finance all promotional expenses as well as any other expense in connection with the development of sales of the company's services and products.
Plaintiff states that he demanded full protection with respect to commissions on all sales which he developed or which were sold through his efforts because, as he told the Ingles and Tobin, plaintiff would have to spend considerable sums of money and expend a great deal of time in developing a new and unknown equipment in the territory. The Ingles then told plaintiff that if plaintiff would undertake to develop these territories and make the necessary expenditures, the Ingles would give plaintiff forthwith an exclusive franchise for life in this territory and any other territory assigned to plaintiff. The only reservation which the Ingles and Tobin made was that plaintiff was to devote his sincere and best efforts to promote the sale of the company's product and that if the plaintiff ever reached a point where he could not devote his personal efforts, he would inform the Ingles at which time the franchise might be terminated by mutual consent. Plaintiff stated that he agreed to accept this exclusive franchise for life; that so long as he was physically able he would undertake to give this engagement his personal attention, and that he also agreed to expend whatever monies would be necessary in furthering the company's business in these territories.
Plaintiff was told by Mr. Edwin H. Ingle that a formal contract would be drafted which would contain all the details, including the exclusive franchise for life, and that Mr. Ingle then expressed his confidence in plaintiff and assured plaintiff that plaintiff would never have to have any *285 other job of any kind as long as plaintiff lived. By letter dated May 30, 1939 Mr. Edwin H. Ingle stated that although they had not taken the time to draw up a formal contract, he was confirming the assignment of the territories and the rate of commissions. Plaintiff admits that from time to time he requested Mr. Edwin H. Ingle to prepare and submit to him a formal written contract, and although Mr. Ingle repeatedly promised to do so, both orally and in writing, he never did so. On April 9, 1940 Mr. Edwin H. Ingle wrote to plaintiff and stated that plaintiff would within a few days "have a regular Franchise from us." No formal contract was ever signed although plaintiff operated the franchise in the territory given to him continuously from May 30, 1939 until the date that he was discharged, in May 1953.
In the latter part of December 1939 plaintiff had another conference with Messrs. Tobin and Edwin H. Ingle regarding plaintiff's exclusive franchise, the commission which he had been receiving and the territories. Both Ingle and Tobin informed plaintiff that because of the amount he spent and the time which he had devoted to the sale of the process, the partnership agreed to increase the rate of commissions and to enlarge the territory. This arrangement was confirmed by letter from Tobin to plaintiff dated January 3, 1940. At a later conference at plaintiff's home Ingle and Tobin said that the prospect data achieved at plaintiff's expense was the latter's stock in trade and an invested interest in plaintiff's life franchise, and it was agreed that plaintiff would not have to report the names of prospective customers to the company and that plaintiff would make his own arrangements with local representatives employed by him and pay these representatives such commission as plaintiff desired to pay without the company's approval.
In the year 1939 plaintiff spent $906.65 promoting defendant's business and in addition devoted his entire time during the seven months subsequent to May 30, 1939 in promoting the sales of the process in the territory assigned to him. Between the years 1939 and 1952 plaintiff alleges that he also spent $51,697.82 in developing and covering his *286 assigned territories. Plaintiff satisfactorily performed his duties as is indicated by memoranda and letters and by affidavit of Edwin H. Ingle dated May 6, 1953, which states in part:
"Due to the excellent recommendation by Mr. Tobin, and the fact that we were expecting Shiddell to finance his own sales activities without cost to us, it was agreed that our arrangement with Shiddell was on a mutual basis and to continue as long as our respective interests were properly carried out, with the statement that I did not expect Shiddell would ever have to get another job as long as he lived."
In the same affidavit Ingle states that the company's experience with plaintiff was good but that the area was not sufficient to offer him sufficient volume of business to make his franchise attractive, and by mutual agreement in the month of December 1939 and January 1940 the territory was enlarged and the commission was increased.
For the sake of clarity we give the defendant's side of the case as we find it from the present record. Mr. Edwin H. Ingle, in an affidavit dated November 12, 1952, categorically denies ever entering into any agreement with the plaintiff for the term of the latter's natural life. This affidavit admittedly contradicts Mr. Ingle's affidavit of May 6, 1953. Robert Browning, general manager of defendant, denies in his affidavit that defendant ever entered into any such agreement with plaintiff or that defendant assumed the obligations of such an agreement made by plaintiff. He sets out excerpts from a long line of correspondence between the partnership, the defendant corporation, and plaintiff and contends that these clearly establish that no definite, determinable agreement was ever entered into with plaintiff for the latter's natural life or for any other fixed or determinable period of time.
Mr. Browning also contends that plaintiff was an independent sales representative on a stated commission basis; that his sales were all subject to approval by defendant; that plaintiff was paid all commissions due him; that there was never any agreement reduced to writing, except as to the *287 territory in which the plaintiff could sell and the matter of commissions which would be paid on orders accepted by defendant; that the sales activities of the plaintiff were a mere privilege terminable at any time at the election of the defendant, which was not required, in any event, to accept or fill orders or commitments solicited by the plaintiff; and, further, denied that defendant at any time took over or assumed any liability or obligation of the plaintiff against the partnership.
Browning quotes from correspondence from plaintiff, trying to show that over the years plaintiff had failed to obtain a formal contract and that the letters proved that the parties had never had a meeting of the minds on the terms of the contract; that on March 11, 1946 plaintiff wrote to Mr. Ingle asking for a written contract and suggested "the period of the agreement will be two years from the date of acceptance" and "that in event the associations under this agreement remain mutually satisfactory, the agreement can and will be automatically renewed on expiration for a like period under the same terms and conditions"; that on January 25, 1947, March 4, 1947, and May 17, 1947 plaintiff was still writing to defendant, requesting a written contract and on the last-mentioned date, proposed in his letter a contract period "for the duration of the normal 3-yr. to 5-yr. normal sales cycle of the equipment"; that Browning, by letter dated June 27, 1947, expressed a willingness to draw a contract including a definite contract period, and that if the plaintiff wished him to work up such a contract, he would do so and that, however, with his letter discussions for a formal contract terminated, and no written agreement, either in draft or final form, ever came into existence.
Mr. Browning further states that plaintiff wrote a letter dated October 14, 1940 to the Treasury Department in which he is alleged to have stated in answer to a questionnaire that the firm had the right to discharge him at any time and on 30 days' notice. As to this, plaintiff replies that neither the original nor a photostatic copy of this alleged statement of plaintiff has been produced and is part of this record; that *288 a questionnaire from the Internal Revenue Department was sent to him by his employer for his signature; that the form submitted was typed by Electro Rust-Proofing Co. and that, when he saw stated therein that the firm had the right to discharge him at any time, he struck out the word "yes" and inserted the word "no." He also states that he crossed out the words "thirty days notice" and inserted the word "no."
Plaintiff contends that the correspondence referred to in the Browning affidavit could only be used by defendant in a trial before a jury for the purpose of negativing the testimony of the plaintiff and in mitigation of any claim by the plaintiff that he had a franchise for life; that unquestionably plaintiff desired to have the arrangements which he made in 1939 and 1940 reduced to writing so that there would be a permanent memorial of the transaction; that plaintiff would have been willing to work out a new arrangement provided the same did not involve the giving up of the rights which he possessed as a holder of an exclusive franchise; and that, if a new contract were worked out between the parties, then plaintiff's vested interest would have been protected, otherwise the plaintiff would not have permitted any modification to be made from the terms of his original commitment.
In summary plaintiff contends that the present record contains sufficient evidence, if uncontradicted or if a jury were to believe plaintiff's testimony and not defendant's, that his rights and obligations were fixed in the years 1939 and 1940; that the terms of his engagement were direct, clear and unequivocal; that what he stated in his affidavits require no necessity for spelling out the engagement by inference; and that an agreement in writing setting forth the terms was a formality and not a condition precedent. 1 Williston on Contracts (1936 rev. ed.), sec. 28, p. 59.
Defendant concludes contrariwise. It is obvious, states defendant, that from the November 1952 affidavit of Ingle, the testimony of Tobin, the denial of Browning and the correspondence referred to in his affidavit, plaintiff has failed to produce anything in opposition to this motion other than ambiguous conclusions and inferences; that plaintiff was *289 nothing more than a sales representative in a designated territory, with no written or oral agreement as to the duration, extent, or terms of his relationship with defendant, except to the extent that he solicited business subject to acceptance by the defendant on terms which it established, and varied from time to time, including the rate of commission it would pay; that the arrangement was more a series of independent agreements arising from the acceptance of each sale by the defendant than a right to continue selling in a manner binding upon the defendant, and that the agreement, whatever it was, if one could properly call the relationship an agreement, was precisely that type of an ambiguous and incomplete situation condemned as being inadequate to spell out a binding contract in the case of Savarese v. Pyrene Manufacturing Co., 9 N.J. 595 (1952); that no real issue of fact exists in this case and therefore that, if we were, arguendo, to assume that all the facts presented by plaintiff are not disputable, they still do not present to the court an issue entitling him to relief.
The weight of authority appears to be that, where such long-range commitments are entered into and sued upon, the intention of the parties to make such a compact must be clearly, specifically and definitely expressed. The intent of the parties may be ascertained from the language employed, from all attending circumstances, and from the presence or absence of the giving by the employee of consideration additional to the services incident to his employment. The rule in New Jersey definitely established in Savarese v. Pyrene Manufacturing Co., 9 N.J. 595, 600-601 (1952), is as follows:
"The adjudications dealing with life contracts have been collected and discussed in 135 A.L.R. 654; 35 Am. Jur. 460, sec. 24, referred to in the recent case of Eilen v. Tappin's, Inc., 16 N.J. Super. 53 (Law Div. 1951), and the generally prevailing rule is set forth as follows:
`* * * in the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional *290 to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor.'
And:
`* * * where the employee has given consideration additional to the services incident to the employment, or, as it is sometimes stated, where the employee purchases the employment, in the absence of a statute, other terms in the contract, or circumstances to the contrary, the contract for permanent employment, for life employment, or for other terms purporting permanent employment, is valid and enforceable and not against public policy, and continues to operate as long as the employer remains in the business and has work for the employee, and the employee is able and willing to do his work satisfactorily and does not give good cause for his discharge, a discharge without cause constituting a breach of such a contract entitling the employee to recover damages therefor.'
Deeming them to be at variance with general usage and sound policy, the courts have shown a marked reluctance to enforce contracts for life employment. In large part this stems from the realization that such contracts frequently are, in practical effect, unilateral undertakings by the employer to provide a job for so long as the employee wishes to continue in it but impose no corresponding obligation upon the latter. In this respect, the burden of performance is unequal as the employer is bound to the terms of the contract whereas the employee is free to terminate it at will.
Agreements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long-range commitments and they must be clearly, specifically and definitely expressed. Only then is it grudgingly conceded that not all such contracts are `so vague and indefinite as to time as to be void and unenforceable because of uncertainty or indefiniteness.' 56 C.J.S., Master and Servant, § 6, page 70, 1 Williston on Contracts, sec. 39, p. 110; 135 A.L.R. 646 et seq."
We agree with the federal court's interpretation of this opinion as set forth in Powell v. Fuller Brush Co., 15 F.R.D. 239, 242 (D.C.N.J. 1954), that:
"Our reading of the Savarese case discloses no such refusal to recognize or enforce a contract of employment for life, as being the law of the State of New Jersey where this Court is sitting; nor does the case reflect any policy of the law of New Jersey indicating that such contracts are not binding in legal principle, or that they are contrary to public policy, but rather it emphasizes that such contracts are difficult in fact to prove, and that most cases involving such fail for insufficiency of evidence to establish them in fact."
*291 Our analysis of the record comprehends a determination that plaintiff has alleged and substantiated an agreement definite in its terms so that the performances to be rendered by each party can be reasonably ascertained; that the salary or commission was agreed to; and that the allegations, if proved, would most convincingly establish clearly, specifically and definitely that it was the intent of the parties to enter into long-term commitments. Furthermore plaintiff's record, if believed by a jury, establishes the expenditure of $52,604.47 at a time in the history of the project when the Ingles and successor companies had little or no liquid assets to promote the venture and the expenditure of the efforts over and above those required of a mere sales representative. The jury might very well find that plaintiff "purchased his employment" by such considerations.
The recital of "facts" alleged by both parties clearly shows that there is not the complete absence of any genuine issue of fact which must be apparent. Here there are issues of fact to be tried and decided no matter how unlikely it may seem to defendant that plaintiff will be able to prove his case. We conclude that the trial court erred in granting the motion for summary judgment on the first and second counts.
In his third count plaintiff claimed that irrespective of whether there was an exclusive franchise for life, or whether there was a contract of hiring for life, plaintiff was entitled to a reasonable notice of termination of his employment. He claims, on this count, that he was not given a reasonable notice and is entitled to damages for loss of earnings for the period of time determined to be reasonable.
Plaintiff's complaint does not allege an alternative theory, namely, that even if it is determined that plaintiff had neither a franchise for life nor a contract for hiring for life, but was hired for an indefinite period, he would then be entitled to reasonable notice of the termination of his employment. He presents such an argument in his brief however. Anticipating a possibility of amendment to encompass such a claim, we refer to this contention but do not decide it since it is not before us. Although New Jersey cases are not noted, *292 we do find respectable authority elsewhere which holds that where a hiring is for an indefinite period and the employer has the right to terminate the services of an employee, the employer must give the employee a reasonable notice and whether or not he has given such a reasonable notice is for a jury's determination. 6 R.C.L. 895; 135 A.L.R. 651-652.
Defendant additionally contends that the alleged agreement is not enforceable under the provision in the statute of frauds, R.S. 25:1-5(e) prohibiting action on an oral agreement that is not to be performed within one year from the making thereof, citing Deevy v. Porter, 11 N.J. 594 (1953). However, in that case the oral agreement was made on June 2, 1951 for a fixed period of one year beginning at a later date upon plaintiff's departure for Africa, and therefore encompassed a time period beyond one year from the date of the oral agreement. Mr. Justice Jacobs pointed out (11 N.J., at page 597):
"Similarly it has been held that an oral agreement bearing no fixed term and possibly performable within the year is not within the statute though the completion of the performance within that time is most unlikely. See Eiseman v. Schneider, 60 N.J.L. 291, 293 (Sup. Ct. 1897); Smith v. Balch, 89 N.J. Eq. 566, 568 (E. & A. 1918); Reynier v. Associated Dyeing & Printing Co., 116 N.J.L. 481, 484 (E. & A. 1936). On the other hand, where the oral agreement does bear a fixed term and is not to be performed within the year it is held to be within the statute even though the obligations thereunder may be terminable by operation of law well within the year; the most common illustration is an oral agreement for personal services for a fixed period exceeding one year but terminable by operation of law upon death. It is settled in our State and elsewhere that such agreement is within the statute."
There is no merit in defendant's special defense of the Statute of Frauds.
Judgment is reversed; costs to abide the outcome of the trial.